**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAROUSH EBRAHIME,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 1534** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Jeffrey Cole** |
| **THOMAS DART, Sheriff of Cook County,** | ) | |
| **COOK COUNTY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff was attacked and beaten in a county courthouse holding cell on February 17, 2009.  At the time, he was a pre-trial detainee in the custody of the Sheriff of Cook County.  He is suing the Sheriff and the County under 42 U.S.C. §1983, alleging that the defendants violated his Eighth Amendment rights by failing to properly and timely address his medical needs following the assault.  He also brings a state law claim for intentional infliction of emotional distress.  The defendants have moved for summary judgment, arguing that there is no genuine issue of fact that plaintiff's constitutional rights were violated, and that they are immune from liability for the state law claim under Illinois's Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act").

# I.

## A.
## Summary Judgment

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007). Once the moving party has made a properly supported motion for summary judgment, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue' for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)(emphasis in original).

## B.
## Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc*., 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc*., 423 F.3d 627,

633 (7th Cir. 2005) The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further consideration. Local Rule 56.1(a)(3); *Smith v. Lamz*, 321 F.3d 680, 682 n.1 (7th Cir. 2003). If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted. Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). District courts are "'entitled to expect strict compliance'" with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's instructions *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir.2004). The court is not required to hunt for evidence in the record that supports a party's case if a party fails to point it out; that is the job of counsel. *See Bay Area Business Council.*, 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission).

**C.**
**Facts**

On February 17, 2009, plaintiff was a pre-trial detainee at the Cook County Department of Corrections ("CCDOC"), awaiting trial on criminal charges. (*Defendants' Local Rule 56.1 Statement of Facts* ("*Def.St.*"), ¶ 9; *Plaintiff's Response to Def.St.* ("*Pl.Rsp.*"), ¶ 9). He was escorted to the criminal courts building located at 2600 South California Avenue in Chicago, Illinois, so that he could appear on a regularly scheduled court status date, and placed in a holding cell near the courtroom. (*Def.St.*, ¶¶ 11-12; *Pl.Rsp.*, ¶¶ 11-12). There, he was attacked and beaten by another detainee. (*Def.St.*, ¶ 12; *Pl.Rsp.*, ¶ 12).

At the time, plaintiff was fifty-seven years old. (*Def.St.*, ¶ 10; *Pl.Rsp.*, ¶ 10). He had a heart condition and had previously undergone heart surgery and received six stents. (*Plaintiff's Statement of Additional Facts* ("*Pl.St.*"), ¶ 48; *Defendants' Response to Pl.St.* ("*Def.Rsp.*"), ¶ 48). A sheriff's deputy described his assailant as a "big guy . . . in his 20s, . . . at least 6 feet tall, . . . nearly 200 pounds, . . . who appeared "very strong." (*Pl.St.*, ¶ 1; *Def.Rsp.*, ¶ 1). Plaintiff says that he was hit about ten times about his head, face, chest, torso, and back. (*Def.St.*, ¶ 13; *Pl.Rsp.*, ¶ 13). He claims he suffered a split tongue, chipped tooth, lacerations to his scalp and lip, contusions to his skull, back, and ribs, and severe injury to his right eye. (*Def.St.*, ¶ 14; *Pl.Rsp.*, ¶ 14). When Cook County Sheriffs' deputies became aware of the attack, the first responding officer called for back-up officers, and 911 emergency personnel were called for medical assistance. (*Def.St.*, ¶ 15; *Pl.Rsp.*, ¶ 15). Approximately twenty officers responded. (*Def.St.*, ¶ 16; *Pl.Rsp.*, ¶ 16).

Once the backup officers arrived, they took plaintiff to a separate holding area. (*Def.St.*, ¶ 17; *Pl.Rsp.*, ¶ 17). Emergency medical personnel bandaged plaintiff's head and transported him by

4

ambulance a short distance to St. Anthony's Hospital; he was checked in about 2 p.m. (*Def.St.*, ¶¶ 18-20; *Pl.Rsp*., ¶¶ 18-20). Medical personnel observed that plaintiff had multiple abrasions and contusions all over his head, and "tiny" lacerations to the right lateral orbit and inner cheek. (*Def.St.*, ¶ 21; *Defendant Ex.* 4, at 1765-66; *Pl.Rsp*., ¶ 21). The attending physician ranked his injuries as moderately severe. (*Def.Ex.* 4, at 1766). Plaintiff complained of left-side chest pain, shortness of breath, headache, and dizziness. (*Def.Ex.* 4, at 1766-67). He denied having lost consciousness. (*Def.Ex.* 4, at 1766-67). He rated his pain as a 10 out of 10. (*Def.Ex.* 4, at 1765). He was treated with aspirin and Tylenol, and given oxygen. (*Def.Ex.* 4, at 1767-68). A portable chest x-ray revealed clear lungs and an enlarged heart. (*Def.Ex.* 4, at 1774). A CT scan of plaintiff's head showed a mild septal deviation, but no evidence of intracranial hemorrhage or skull fracture. (*Def.Ex.* 4, at 1771). Plaintiff's pain subsided completely at about 4 p.m. – he then reported his pain as 0 out of 10 – and he was released from St. Anthony Hospital in stable condition later that day at 6:15 p.m., still saying he was in no pain. (*Def.Ex.* 4, at 1765).

From St. Anthony's, plaintiff was taken to Cermak Hospital, on CCDOC grounds, where medical personnel examined him again. (*Def.St.*, ¶ 22; *Pl.Rsp*., ¶ 22). Plaintiff testified that his problem with his treatment is that he did not receive timely medication or timely medical visits from Cermak personnel. (*Def.St.*, ¶ 40; *Pl.Rsp*., ¶ 40). Over the next two days, plaintiff was given a cold compress for his pain. (*Def.St.*, ¶ 23; *Pl.Rsp*., ¶ 23). Plaintiff says he got a single cold compress in those two days (*Pl. Ex.* 8, Pl.Dep., at 120), but the medical record indicates that he was to have been given a cold compress four times a day – "QID" – during that period. (*Def.Ex.* 2(7), at 3). There is no order for any type of pain medication during that time. (*Def.Ex.* 2(7), at 3). Cermak Nurse Judy Price testified that she was unable to confirm whether plaintiff actually received the ice-packs

as often as he was supposed to because her nurses were "very bad with documenting." (*Pl.St.*, ¶ 16; *Pl.Ex.* 5, Price Dep., at 91; *Def.St.*, ¶ 16). The Cermak physician treating plaintiff who ordered the four daily compresses– Dr. Paul Skirvan – testified that if plaintiff hadn't received them as directed, he would have suffered pain and swelling. (*Pl.St.*, ¶ 23; *Pl.Ex.* 6, at 106; *Def.Rsp.*, ¶ 23).

Plaintiff filled out a Detainee Health Service Request Form on or about February 20, 2009, requesting treatment for pain in the shoulder, head, right eye, ear, ribs and back, as well as trouble sleeping, dizziness, and possible bleeding from the right ear. (*Def.St.*, ¶ 26; *Pl.Rsp.*, ¶ 26; *Def.Ex.* 3(1)). He also filed a Detainee Grievance, dated February 20th, stating that he "need[ed] to see a doctor ASAP." (*Pl.Ex.* 10).[1] When there was no response, he filled out a second health service request form the next day. (*Pl.Ex.* 10(2)). Three days after his initial request, plaintiff was seen at "sick call" by Nurse Price and Dr. Ledvora on February 23, 2009, and was said to have vital signs within normal ranges and be in "no acute distress." (*Def.St.*, ¶ 27; *Pl.Rsp.*, ¶ 27). Dr. Ledvora examined plaintiff's eye and observed some bruising about the right eye, a small bump or swollen area on the right temple area; exam of the eye itself was normal. (*Def.St.*, ¶ 28; *Pl.Rsp.*, ¶ 28). Upon further examination, the doctor found no lesions in plaintiff's mouth. (*Def.St.*, ¶ 29; *Pl.Rsp.*, ¶ 29). Lungs were clear, but there was some left rib cage tenderness. (*Def.St.*, ¶ 30; *Pl.Rsp.*, ¶ 30). Dr. Ledvora referred plaintiff to an ophthalmologist for an eye exam, ordered rib x-rays, and a brain CT scan. (*Def.St.*, ¶ 31; *Pl.Rsp.*, ¶ 31). The doctor also prescribed plaintiff Robaxin (a muscle relaxant) and Atarax (an anxiety medicine), and made a notation in the record to have plaintiff follow up with a medical visit in ten days. (*Def.St.*, ¶ 32; *Pl.Rsp.*, ¶ 32).

---

[1] The form indicates that the February 20th grievance, for whatever reason, was not received until February 23rd.

6

Plaintiff saw an ophthalmologist at Cermak later that day. (*Def.St.*, ¶ 33; *Pl.Rsp.*, ¶ 33). He also had his ribs x-rayed, a CT scan of his eye sockets, and a CT scan of his head. (*Def.St.*, ¶ 34; *Pl.Rsp.*, ¶ 34). The CT scan of the head revealed nothing other than "soft tissue swelling over the left frontal and parietal region." (*Def.Ex.* 3(6)). Dr. Ledvora characterized the scan as normal. (*Def.St.*, ¶ 35; *Pl.Rsp.*, ¶ 35). He said that the results were "really good for someone who's had head trauma." (*Def.St.*, ¶ 36; *Pl.Rsp.*, ¶ 36). The CT scan of the eye sockets revealed "a defect along the anterior nasal septum and underlying post traumatic defect of the septum is most likely." (*Pl.Ex.* 3(6)). Dr. Ledvora said that plaintiff "might have had a little blunt trauma to the nose. Nothing he's going to run off to a surgeon for an immediate procedure for." (*Pl.St.*, ¶ 35; *Def.Rsp.*, ¶ 35; *Pl.Ex.* 7, at 72).

The rib x-ray revealed healed fractures to the left 5th, 6th, 7th, 8th, and 9th ribs. (*Def.Ex.* 2(3)). Dr. Ledvora testified that he:

> kn[e]w he's got a rib fracture. A rib fracture, the management is some pain medication and you let it heal. A rib fracture knocks a pro football player out of the game for a few weeks. Is there any reason to expect he's not going to have any discomfort? He's a 60-year-old guy. But if I keep layering medicines on top of what he's already on, I could do him a great disservice.

(*Def.Ex.* 3, Ledvora Dep., at 84).

Plaintiff was given muscle relaxers and a pain relievers from February 23, 2009 to March 21, 2009. (*Def.St.*, ¶ 37; *Pl.Rsp.*, ¶ 37). Plaintiff testified that the medication didn't work, and upon request to the Cermak doctor, the doctor doubled his prescription. (*Def.St.*, ¶ 38; *Pl.Rsp.*, ¶ 38). All told, between February 17, 2009, and February 23, 2009, plaintiff got medications from Cermak personnel for his heart, cholesterol, sleeping, and psychiatric conditions. (*Def.St.*, ¶ 39; *Pl.Rsp.*, ¶ 39).

On March 5, 2009, plaintiff received Tylenol and a cold compress from Cermak personnel. (*Def.St.*, ¶ 41; *Pl.Rsp.*, ¶ 41). On March 9, 2009, Dr. Ledvora ordered a non-emergency EKG4 for Plaintiff, as part of plaintiffs routine health maintenance. (*Def.St.*, ¶ 42; *Pl.Rsp.*, ¶ 42). Plaintiff filed his lawsuit on March 11th. He filled out a "Detainee Health Service Request Form" to be seen for difficulty walking, blurry vision and back pain on March 23, 2009, and was seen by Dr. Ledvora the same day. (*Def.St.*, ¶ 43; *Pl.Rsp.*, ¶ 43). Plaintiff's back and torso were x-rayed on April 1, 2009, (*Def.St.*, ¶ 44; *Pl.Rsp.*, ¶ 44). On the 10th, he saw a Cermak doctor for back pain, sore throat and runny nose. (*Def.St.*, ¶ 45; *Pl.Rsp.*, ¶ 45).

On May 20, 2009, Dr. Ledvora renewed plaintiff's prescription for Robaxin, the muscle relaxant, in response to his complaints of back pain and trouble sleeping. (*Def.St.*, ¶ 46; *Pl.Rsp.*, ¶ 46). Dr. Ledvora testified that giving plaintiff stronger pain medications, at that time, could have been contrary to plaintiff's best interest since plaintiff was already on multiple other medications for other ailments, and adding stronger pain medication may have upset those existing medications. (*Def.St.*, ¶ 47; *Pl.Rsp.*, ¶ 47). On May 26, 2009, plaintiff saw Dr. Ledvora with complaints of back pain and difficulty sleeping; plaintiff was put on a more powerful pain medication, Salsalate, at that point. (*Def.St.*, ¶ 48; *Pl.Rsp.*, ¶ 48; *Pl.St.*, ¶ 39; *Def.Rsp.*, ¶ 39). Dr. Ledvora ordered a chest x-ray to follow up on the healing of plaintiff's rib fractures. The doctor felt plaintiff "looked pretty good for what he's been through and his multiple problems." (*Def.St.*, ¶ 49; *Pl.Rsp.*, ¶ 49).

Dr. Ledvora testified that he didn't think plaintiff "ever presented with the manifestations of a severe injury" and that he remembered "in a subjective way his presentations were very consistently on the dramatic side for what my physical exam showed." (*Def.St.*, ¶ 50; *Pl.Rsp.*, ¶ 50). The doctor felt he "ordered enough tests to make sure that there was nothing serious there."

8

(*Def.St.*, ¶ 51; *Pl.Rsp.*, ¶ 51).   "Now that I've seen so many records," Dr. Ledvora said, "he's getting

a lot of follow-up from medical and psychiatric staff here. So he's had a lot of – well, I shouldn't say

he's had a lot.  He's had multiple visits and follow-up with medical providers and psychiatric

providers."  (*Def.St.*, ¶ 52; *Pl.Rsp.*, ¶ 52).

## II.
## ANALYSIS

### A.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary

and wanton infliction of pain ... proscribed by the Eighth Amendment," and this includes

"indifference ... manifested by prison doctors in their response to the prisoner's needs or by prison

guards in intentionally denying or delaying access to medical care or intentionally interfering with

the treatment once prescribed."  *Estelle v. Gamble,* 429 U.S. 97, 104-105 (1976)(footnotes and

internal quotation marks omitted); *Erickson v. Pardus*, 551 U.S. 89, 90 (2007).[2]  On the other hand,

"an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary

and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S.

at 105-06.  Physician negligence, or medical malpractice, "does not become a constitutional

violation merely because the victim is a prisoner." *Id.*

---

[2] Prisoners' rights are guaranteed by the Eighth Amendment; they are protected only from the infliction of cruel and usual punishment. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009); *Payne*, 161 F.3d at 1040 (7th Cir. 1998).  The plaintiff was not a prisoner, but a detainee, meaning he was not "punishable" at all. *Lewis*, 581 F.3d at 473; *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998).  As such, his rights – like the rights of all detainees – are guaranteed by the Fourteenth Amendment. *Lewis*, 581 F.3d at 473; *Payne*, 161 F.3d at 1040.  In the context of a medical needs claim, the Fourteenth Amendment analysis is identical to the Eighth Amendment analysis. *Lewis*, 581 F.3d at 473; *Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir.2007); *Guzman v. Sheahan,* 495 F.3d 852, 856-57 (7th Cir. 2007).

In order to survive summary judgment on a claim for deliberate indifference to serious medical needs, a plaintiff must show that he had an objectively serious medical need, and that the defendants were deliberately indifferent to it. *See Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir.2008); *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir.1996) ("[A] prison official may evidence deliberate indifference by failing to treat or delaying the treatment of a serious medical need. However, for liability to exist the medical need must be objectively serious."). A delay in the provision of medical treatment for painful conditions-even non-life-threatening conditions-can support a deliberate-indifference claim, *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997), so long as the medical condition is " 'sufficiently serious or painful,' " *id.*(quoting *Cooper v. Casey,* 97 F.3d 914, 916 (7th Cir.1996)).

A successful deliberate indifference claim comprises both an objective and a subjective element. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011). An inmate must demonstrate that, objectively, the deprivation he suffered was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Roe,* 631 F.3d at 857; *Walker v. Benjamin,* 293 F.3d 1030, 1037 (7th Cir. 2002). A medical need is considered sufficiently serious if the inmate's condition "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005); *Roe,* 631 F.3d at 857. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010); *Roe,* 631 F.3d at 857.

10

Second, an inmate must establish that prison officials acted with a "sufficiently culpable state of mind" to support liability under § 1983. *Farmer,* 511 U.S. at 834; *Roe*, 631 F.3d at 857. Although negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care. *Walker,* 293 F.3d at 1037. "[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain. *Estelle,* 429 U.S. at 104-05; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); *Gayton v. McCoy,* 593 F.3d 610, 619 (7th Cir.2010)(7th Cir.2007). The defendants submit that plaintiff has failed to create a genuine issue of fact that would require a trial on either element.

## B.

The defendants' position on the objective element may be readily dismissed. As already noted, a medical need is serious enough in this analysis if the inmate's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005); *Roe*, 631 F.3d at 857. Indeed , n discussing the underlying principles governing the obligation to provide medical care to inmates, the Court in *Estelle* made clear that the obligation extends not only to those cases in which the denial of care "may actually produce physical torture or a lingering death" but also those in which "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Gutierrez*, 111 F.3d at 1371.

11

The plaintiff was beaten by a man at least thirty years his junior, who was significantly taller than him and outweighed him substantially. He was trapped in a confined area with his attacker. The beating resulted in several broken ribs, multiple, albeit small, lacerations and abrasions to the head, and perhaps a broken nose. The attending physician at St. Anthony's categorized his injuries as moderately severe. Dr. Ledvora acknowledged that the injuries the diminutive, fifty-seven-year-old plaintiff suffered would knock an NFL athlete out of action for weeks. It can safely be said that plaintiff's condition was serious enough that a lay person would realize he needed to see a doctor. Broken ribs alone would be sufficient to meet the objective prong. *Moore v. Brown*, 2010 WL 381331, *2 (S.D.Ill. 2010); *Griffin v. Donelli*, 2010 WL 681394, *8 (N.D.N.Y. 2010); *Glass v. Woodford*, 2009 WL 3126240, *5 (E.D.Cal. 2009); *Torres v. New York City Dep't of Corrs.,* 1995 WL 63159, at *1 (S.D.N.Y. 1995); *see also Estelle*, 429 U.S. at 107 (lower back strain enough);. *Grieveson v. Anderson,* 538 F.3d 763, 778-80 (7th Cir.2008)(broken nose sufficiently serious); *Gutierrez,* , 111 F.3d 1364)(infected cyst sufficiently serious); *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir.1996)(cuts, muscle pain, and burning eyes from mace sufficiently serious)Gutierrez,111 F.3d at 1372 (" This Court's post- *Estelle* decisions, as well as those of the other circuit courts, have repeatedly recognized that delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims.").

In *Grieveson*, the plaintiff was taken to the hospital on December 3, following a beating by a fellow inmate on November 30. On November 31, Grieveson told a guard that his nose was broken and was bleeding down his throat. Nothing was done. The next day he told other guards of his injuries, but still did not receive any medical care. On December 2, Grieveson filled out a "medical call card." Finally on December 3, he was taken to the hospital where it was confirmed that he had

12

a broken nose. This was sufficient to raise an issue of fact. 538 F.3d at 779. *See infra* at 15. To argue

otherwise, as the defendants have done, is unpersuasive. Their reply brief asserts that "the medical

records and medical testimony by Dr. Ledvora indicate that [plaintiff's] injuries from February 17,

2009, do not rise to the level of implicating the objective prong of the deliberate indifference

analysis" and cite *Gutierrez* in support. Beyond the fact that the medical evidence does *not* support

the defendants' position, *Gutierrez* found that an infected cyst on the plaintiff's back was a

sufficiently serious medical condition for these purposes. That seems to pale by comparison with

the beating the plaintiff suffered. Moreover, nowhere in his testimony did Dr. Ledvora state that

plaintiff's condition did not warrant medical treatment. He testified that the plaintiff was definitely

in pain, that he had been through a lot, and he prescribed the plaintiff a regimen of painkillers,

changing to a stronger type of medication when lesser medicines were initially ineffective. Given

the record and the caselaw, there is at least a genuine issue of material fact as to whether the

plaintiff's injuries were sufficiently serious as measured by objective standards.[3]

## C.

The plaintiff contends that there is a genuine issue of material fact regarding the subjective

element of his claim because:

> [he] was forced to suffer significant pain for several days while waiting for treatment
> of his injuries. When [he] did finally receive treatment, it was either insufficient to
> manage his pin, woefully tardy, or blatantly incomplete. . . . Dr. Ledvora prescribed
> a more powerful painkiller, Salsalate, two and a half months after [plaintiff] filed the
> instant lawsuit on March 11, 2009. . . . The Defendants' actions constituted a refusal

---

[3] One hopes that this position is that of misguidedly zealous counsel rather than the defendants themselves, because if it is the defendants' true position that injuries like those the plaintiff sustained while in their custody are not sufficiently serious to warrant medical attention, they are essentially admitting that they have a policy of deliberate indifference to serious medical needs.

13

> to treat his chronic pain and created a delay in providing proscribed pain medication.
> As a consequence, [plaintiff] suffered in serious, intractable pain.

(*Plaintiff's Memorandum*, at 6-7).

After the attack on February 17th, plaintiff received almost immediate medical treatment at a local hospital. Upon his release later that same day, he was in stable condition and, after having been treated with aspirin and Tylenol, reported he was in no pain. He then received further evaluation at Cermak Hospital. Accordingly, it would be difficult to say that there is a genuine issue of material fact regarding the defendants' claimed deliberate indifference to plaintiff's medical needs on the day he was beaten. Plaintiff's needs were swiftly attended to and he was provided treatment until he said he was no longer in pain. If this were all there were to the claim, summary judgment would be appropriate.

But, what happened after he was in the hands of the Cermak medical personnel from the evening of February 17th on is not so clear cut. *Grieveson* compels the conclusion that there is a genuine issue of material fact with regard to the period between February 20 and February 23, during which Mr. Ebrahime did not receive medical treatment the Cermak doctor prescribed, which was four cold compresses per day. Beginning on February 20th, plaintiff repeatedly informed the defendants, through health service requests and a grievance, that he was, once again, experiencing significant pain. That's not surprising after the beating he received, and given the fact that plaintiff had not been given any medication after he left St. Anthony's. Over a course of three days following his attack, he may have received only a single cold compress. The nurse in charge suggested there was no way to tell from the medical records because the staff's documentation

procedures are very lax.[4]  *See Aldridge v. Montgomery,* 753 F.2d 970 (11th Cir.1985)(reversing directed verdict for defendants where evidence indicated that jailers refused to give inmate ice packs and aspirin for sutured cut above inmate's eye).

After two days with only a single cold compress, on February 20th, the plaintiff filled out a request for medical treatment because he was feeling too much pain and bleeding from his ear. Nothing happened that day, and plaintiff tried again on the 21st.  It wasn't until February 23rd that medical personnel looked in on plaintiff.  In short, after suffering a beating from a very large and strong man, severe enough to break a few ribs, blacken an eye, draw blood, and maybe break a nose, the plaintiff may well have been treated with a single cold compress over a several-day period, and received no treatment at all for three days after he alerted the defendants to his medical situation.

In *Grieveson*, the Seventh Circuit found that a less than two-day delay in treating a broken nose was enough to survive summary judgment:

> Based on the evidence provided by Grieveson, a jury could further infer that the delays of Officers Highbaugh, Cornell, and Duncan in arranging medical treatment caused Grieveson "that many more hours of needless suffering for no reason." *Id.* According to Grieveson, these three guards knew that he was in pain, but they did not secure medical treatment for him until, at the earliest, one-and-a-half days after they knew about the injury. Grieveson's affidavits create a genuine issue of fact as to the officers' states of mind. "Although a negligent or inadvertent failure to provide adequate medical care is insufficient to state a deliberate indifference claim, it is enough to show that a defendant actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard to that risk." *Gil v. Reed,* 381 F.3d 649, 661 (7th Cir.2004); *see also Williams,* 491 F.3d at 716 ("[A] jury could find that the defendants'

---

[4] Indeed, as things now stand, there is no evidence that he received the prescribed treatment, and the plaintiff has said he did not.

> delay caused [the inmate] six extra hours of pain and dangerously
> elevated blood pressure for no good reason.").

538 F.3d at 779 - 780.[5]

Here, also, the defendants were informed of the plaintiff's situation – more than once, and in writing – yet did not act for three days. Although the plaintiff cites *Grieveson* in his response to defendants' summary judgment motion, the defendants fail to address it in their reply. That omission is significant. *Gonzalez -Servin v. Ford Motor Co.*, 662 F.3d 931, 933 (7th Cir. 2011)(failure to respond to a cited case is an "implicit concession" of its accuracy).

Instead, they point out that during the period under scrutiny, plaintiff received cholesterol and heart medication, as well as medication for sleeping and psychiatric conditions. (*Defendants' Reply,* at 3). While true, the argument is irrelevant. The gravamen of the plaintiff's case is the absence of treatment for the effects of the beating for three days. While *Grieverson* did not set down a universal rule, if two days is too long for a broken nose, then it's safe to say it's too long for broken ribs – at least on summary judgment. In sum, the defendants have failed to demonstrate they are entitled to summary judgment. "The issue . . . [of] whether the plaintiff[] w[as] in sufficient pain to entitle [him] to pain medication" during the few days "after the beating. . . . [is] an issue for the jury." *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996).

After the 23rd, however, plaintiff's arguments do not fare well. He was given CT scans of his head and his eye sockets, and his ribs were x-rayed. Dr. Ledvora prescribed muscle relaxers and

---

[5] While Mr. Grieveson also received several subsequent beatings and was denied medical care in connection with them, they were not the basis of the court's conclusion as to the broken nose, as evidenced from the section quoted above.

anti-anxiety drugs to manage plaintiff's pain. Plaintiff also received medical attention for his injuries on March 5th, March 9th, March 23rd, April 1st, and April 10th. That's a fairly regular schedule. Dr. Ledvora renewed plaintiff's prescription for muscle relaxants on May 20th, when plaintiff complained about difficulty sleeping due to his injuries. And, when that level of medication proved insufficient, the doctor prescribed something stronger on May 26th.

Plaintiff's position on this period of time is that he should have gotten stronger medication far earlier than May 26th. The problem with this argument is that he points to nothing in the record that suggests he need anything stronger or even asked for it. The plaintiff claims that he "submitted several grievance forms to Cook County Jail personnel seeking medical treatment." (*Pl.St.*, ¶ 45). But the exhibit he cites to support this assertion shows he submitted a single grievance, the one he filed February 20, 2009. (*Pl.St.*, ¶ 45; *Pl.Ex.* 10). Moreover, the exhibit also demonstrates that plaintiff has only filed five health service requests: the two in the immediate wake of his attack in February 2009, one on March 23, 2009, one the previous September, and one the previous June. (*Pl.Ex.* 10). The last two obviously have nothing to do with the subject of this litigation, the attack in the courthouse lockup. The September 2008 request simply said "kidneys," while the June 2008 request dealt with headaches from an eyeglasses prescription. The March 23rd request resulted in an immediate visit with Dr. Ledvora.

So, in the aftermath of his beating, the only requests for medical attention that did not elicit a prompt response were those in the first few days after the beating. If plaintiff was in need of more medical attention thereafter than he was receiving, or his medication regimen was ineffective, he certainly did not make this known to the defendants. The level of his pain – like anyone's pain – is subjective. The Cermak medical personnel could not be expected simply to guess that his

medication wasn't working before May 26th. Consequently, there is nothing to show that the defendants *were aware* of his medical need, a key element of the deliberate indifference claim. *See Farmer*, 511 U.S. at 829 (plaintiff must show official was subjectively aware of risk); *McGowan*, 612 F.3d at 640 ("Even gross negligence is insufficient to establish a constitutional violation if the defendants are not subjectively aware of a risk of harm from their inadequate treatment."); *Estrada v. Reed*, 346 Fed.Appx. 87, 91, 2009 WL 2922951, *4 (7th Cir. 2009)(no deliberate indifference where plaintiff received treatment when he made his needs known to staff).

Moreover, it should be noted that Dr. Ledvora indicated that he had to be careful about prescribing stronger painkillers for the plaintiff because his was already on an array of medications for various ailments he had before he was in custody. He said he was reluctant to keep "layering" medication on top of those plaintiff was already receiving because it could be a "great disservice" to plaintiff. On this record, that is a permissible choice of treatment by a physician and does not give rise to an Eighth Amendment claim. *McGowan*, 612 F.3d at 641. The plaintiff offers no expert opinion to the contrary.

## D.

Defendants next argue that plaintiff cannot maintain a claim for supervisory liability against them because he cannot show that they maintained policies, practices or customs which demonstrated deliberate indifference to serious medical needs and led and caused him to suffer a violation of his Constitutional rights. Supervisory liability under § 1983 may be shown by "'creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue.'" *Vance v. Rumsfeld*, 2011 WL 3437511, *10 (7th

Cir. 2011)(quoting *Richardson v. Goord,* 347 F.3d 431, 435 (2nd Cir.2003)). The policy or custom may take the form of an implicit policy or a gap in expressed policies. *Thomas v. Cook County Sheriff's Dept.,* 604 F.3d 293, 303 (7th Cir. 2010). Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that caused the alleged constitutional harm. *Grieveson,* 538 F.3d at 772*; Woodward v. Corr. Med. Serv. of Ill., Inc.,* 368 F.3d 917, 928 (7th Cir. 2004).

To make the required showing, the plaintiff relies on a few pieces of evidence, beginning with the defendants' policy regarding the treatment of grievances for medical attention, as set forth in the defendants' General Order 14.5. (*Plaintiff's Memorandum,* at 7-10; *Pl.St.,* at ¶¶ 3-14; *Pl.Ex.* 3). In pertinent part, the official policy on grievances states:

> 2. The grievances will be placed in the designated locked box located on each living unit within fifteen (15) days after the alleged grievable event has occurred . . . .

> 3. Written grievances shall be collected Monday through Friday by the Correctional Rehabilitation Worker. Special procedures for the collection of emergency grievances are set forth under article III, E of this General Order. 2 [sic]

> 4. Within 48 hours (not including weekends) after the grievance is collected, the [Correctional Rehabilitation Worker] will obtain an assigned Grievance Case Number. . . .

> \*      \*      \*

> 10. If the grievance is not resolved in a timely fashion (not to exceed 30 days from the date the grievance was filed), the [Correctional Rehabilitation Worker] will notify the divisional Superintendent for status review.

19

Grievances regarding "emergencies" are handled differently: "Emergency grievances" are defined as "those involving an *immediate threat* to the welfare or safety of a detainee." ¶E (emphasis supplied):

E. Emergencies

*        *        *

2. Processing for all emergency grievances will begin with the initial determination by the receiving [Correctional Rehabilitation Worker] or Shift Commander that the issue raised is an emergency.

3. Responses and decisions to emergency grievances shall occur no later than 48 hours from receipt *and sooner if warranted*. In the absence of the Administrator of Program Services or designee the shift commander will forward a written response to the detainee within the time frame.

(*Pl.Ex.* 3, at 2311-13)(emphasis supplied).

In the case of an ordinary, non-emergency medical grievance, the defendants' staff can follow official policy, which may take up to 30 days to resolve. In an emergency situation, i.e., one involving "an immediate threat" to the welfare or safety of a detainee, the policy allows up to two days for a written response, "or sooner if warranted," which presumably will depend on the individual employees' perception of the exigency of the situation. If the danger is immediate, it would certainly seem that postponing the response for up to two days would be inappropriate and would effectively authorize in cases of real exigency indifference to medical needs. "Danger invites rescue. The cry of distress is the summons to relief." *Wagner v. Int'l Ry. Co.,* 232 N.Y. 176, 133 N.E. 437, 437 (1921) (Cardozo, J.). And not at some indeterminate point in the future.

Apart from its terms, which authorize a response time of up to two days, in actual practice, the policy is far less exacting and operates in a way that fosters and condones medical indifference for extended periods beyond the prescribed two-day period. The testimony of John Mueller, the assistant administrator of the Cook County Department of Corrections, is significant. (*Pl.St.*, ¶¶ 3-11; *Pl.Ex.* 2). He explained how the policy works in actual operation and the practical aspects of handling detainee grievances for medical attention. The 48-hour period is actually the time that passes before the correctional rehabilitation worker even delivers it to the Cermak Hospital. (*Pl.Ex.* 2, at 61-62).[6] He added the proviso that "no one works on weekends" (*Pl.Ex.* 2, at 62), so that could double the lag time before the medical staff even see a grievance depending on the day it was filed. Mr. Meuller said that, in a typical month, there are 180 medical grievances. (*Pl.Ex.* 2, at 67-68).[7] Of those 180, there are generally 20 that he has to follow up on because Cermak fails to respond one way or the other for 30 days. (*Pl.Ex.* 2, at 67-69). Mr. Mueller said his office treats all grievances the same, regardless of the urgency of the medical condition because they are not qualified to make such medical severity determinations. There is no difference between how a request for a band aid is handled and how a complaint about a broken leg is handled; both are still subject to that two-day lag time. His office leaves such medical determinations to the Cermak Hospital. (*Pl.St.*, ¶ 5; *Pl.Ex.*

---

[6] Defendants argue that the Sheriff is not responsible for providing medical care to detainees and should not be subject to plaintiff's deliberate indifference claims. (*Defendants' Memorandum*, at 12-13). But this argument is not compelling given the fact that plaintiff is relying on the Cook County Department of Corrections policy for processing grievances, including those for medical attention, and that is within the Sheriff's purview, and allegedly in this case caused the failure to receive medical attention.

[7] The plaintiff misreads Mr. Meuller's testimony as indicating that a typical month produced just 20 medical grievances. (*Pl.St.*, ¶ 3).

2, at 77-78).[8]  If Cermak turns down the detainee's medical grievance, it might be another 90 days

for the appeal process to run its course.  (*Pl.St.*, ¶ 5; *Def.Rsp.*, ¶ 6).

The response to this consists of the observation that "[p]laintiff filed a grievance regarding

medical care on February 20, 2009, and he was seen by Dr. Ledvora only three days later, which was

the same day the form was received by the [Correctional Rehabilitation Worker] . . . ." (*Defendants'*

*Reply*, at 4).  But the difficulty with this argument is that it does not answer the question of whether

there is in place a policy that allows and almost inevitably causes indifference to the need for prompt

medical care.  Cases like *Grieveson* hold that a less than three-day response time may not pass

muster.  Here, three days passed.  Moreover, one can easily imagine many more situations involving

similar or worse injuries or even more pressing medical needs where three days would clearly be

too long to wait.

So, again, the evidence shows that the manner in which the procedures in place are executed

not merely allows for but actively results in constitutionally unacceptable delays in certain cases in

providing needed medical care to detainees.  *See Grieveson*.[9]  In *Thomas*, the Seventh Circuit found

---

[8] Although neither party points this out, under the defendants' written procedure, the correctional rehabilitation worker is supposed to make an initial determination of whether a grievance presents an emergency. (*Pl.Ex.* 3, at 2313).  So, it is not entirely clear why Mr. Mueller would testify that his staff has no responsibility to separate paper cuts from broken legs.

[9] The plaintiff also points to the testimony of Nurse Price from Cermak, but she covered what happened with medical request forms, not grievances.  (*Pl.St.*, ¶ 13-15).  The plaintiff offers no evidence as to what the official policy for processing such requests, only Nurse Price's testimony as to delays concerning *his* request. (*Pl.St.*, ¶ 13-17).  This is a single instance, and that's not enough to demonstrate a policy or custom.  While the Seventh Circuit has refused to adopt any bright-line rules defining a "widespread custom or practice," one instance – as with the plaintiff here – is insufficient; in fact, three such instances would also be insufficient.  *Thomas*, 604 F.3d at 303.  Moreover, none of Nurse Price's explanations for what happened – less than dedicated fellow nurses, some nurse's reluctance to be called into depositions, and the possibility that she forgot to enter some information on plaintiff's injuries – are linked to a policy or custom.  So there is no evidence of an express policy either.

that similar testimony about the realities of processing medical request forms was sufficient to

present an issue for a jury. Given such testimony, the Seventh Circuit said the situation was not "an

isolated act of an individual employee, which would be insufficient to establish a widespread custom

or practice." 604 F.3d at 303-04. The combination of the written policy, and the realities of daily

practice as described by Mr. Mueller, are enough to make summary judgment inappropriate.[10]

### E.

Finally, the defendants submit that, under the Illinois Tort Immunity Act, they – the Sheriff

and Cook County – are immune from liability for infliction of emotional distress. They cite the

following portion of the Act:

> Neither a local public entity nor a public employee is liable for injury proximately
> caused by the failure of the employee to furnish or obtain medical care for a prisoner
> in his custody; but this Section shall not apply where the employee, acting within the
> scope of his employment, knows from his observation of conditions that the prisoner
> is in need of immediate medical care and, through willful and wanton conduct, fails
> to take reasonable action to summon medical care. Nothing in this Section requires
> the periodic inspection of prisoners.

745 ILCS 10/4-105. Cook County is obviously a local public entity, and the defendants submit that,

because he is sued only in his official capacity, the Sheriff is as well. They cite no case law to

support this proposition, which would ordinarily mean their argument is waived. *Judge v. Quinn*,

612 F.3d 537, 557 (7th Cir. 2010); *United States v. Useni,* 516 F.3d 634, 658 (7th Cir. 2008). But

the plaintiff does not even respond to the defendants' argument, apparently abandoning this claim.

---

[10] The plaintiff also adverts to the July 2008 Department of Justice investigatory report which found, *inter alia*, that "certain conditions at [Cook County Jail] violate the constitutional rights of inmates" and that "inmates do not receive adequate medical and mental health care." (*Pl.St.*, ¶ 50; *Def.Rsp.*¶ 50). The defendants make no response to this part of plaintiff's presentation (*Defendants' Reply*, at 4-5), and so any argument they might have made about its admission or import is waived. Gonzalez -Servin,, 662 F.3d at 933.

And he has therefore waived any waiver argument he might have made. *United States v. Woods*, 148 F.3d 843, 849 n.1 (7th Cir. 1998); *Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 805 n.4 (7th Cir. 1998).

In any event, the defendants are correct. The Seventh Circuit has indicated that, an official capacity suit against the Sheriff is against the Sheriff's *office*, and for the purposes of the Illinois Tory Immunity Act, the "office itself seems to be a "local public entity.'" *Carver v. Sheriff of LaSalle County, Illinois*, 243 F.3d 379, 383 (7th Cir. 2001). Accordingly, the defendants are immune under the pertinent provision of the Act and summary judgment is appropriate on plaintiff's intentional infliction of emotional distress claim.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [#89] is DENIED in part, and GRANTED in part. It cannot be too strongly stressed that a denial of summary judgment is not an endorsement is not an endorsement of a plaintiff's testimony or of the persuasiveness of the evidence offered in opposition to the motion. It simply means that on the current record there are genuine issues of material fact that must be resolved by a jury.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: January 6, 2012

24